HENRY F. PRUE, Administrator, *vs.* THE NEW YORK, PROVIDENCE & BOSTON RAILROAD COMPANY.

A plaintiff whose own conduct has exposed him to the risk of injury cannot maintain an action for damages unless the defendant, notwithstanding the plaintiff's negligence, could by the exercise of reasonable care in the circumstances have avoided causing the injury.    In the latter case the plaintiff's negligence is a remote not a proximate cause of his injury.

B. was killed at a railroad crossing while driving his team over it.    A train was approaching from each direction.    The view of the track extended further in one direction than in the other.    The electric signal bells sounded.    B. seemed to be watching one train only.    He was warned to stop but did not understand English.    The railroad gates were lowered both behind and in front of him.    There was evidence that B. could have saved himself had the gate not been lowered in front of him.    In an action by B.'s administrator against the R. R. Co. for causing B.'s death,

*Held,* that a non suit was improperly granted.

PLAINTIFF'S petition for a new trial.

*August* 14, 1893.   ROGERS, J.   Andre Blais, the plaintiff's intestate, was fatally injured while driving a load of hay across the defendant's track at a grade crossing on Hamlet avenue, a public street in the outskirts of the city of Woonsocket, November 12, 1891, at 6.15 P. M.; and this action is brought to recover damages for his death occasioned by the alleged negligence of the defendant in running a train of cars and in the management of the crossing gates at said crossing.

At the trial of the case before a jury the presiding justice, at the close of the plaintiff's testimony, non suited the plaintiff, on the ground that the plaintiff's intestate was guilty of contributory negligence, and the question now arising on petition for a new trial is whether the non suit was properly granted.

The crossing where the accident occurred is upon a curve in the railroad towards the west, the railroad being double tracked and running north-westerly, so that it crosses the avenue diagonally, as the latter runs nearly east and west, and Blais was approaching from the east.  Crossing-gates with a gate tender, and an automatic electric alarm were provided by the defendant.

While there is not entire accord as to where Blais was when the electric alarm began to ring, for there were two trains approaching the Hamlet crossing at the time, one on the east track coming from Woonsocket, and the other on the west track coming at the rate of forty miles an hour from Providence, yet there can be no doubt from the testimony of those having the best opportunity to know, that the electric bell began to ring before Blais reached the tracks, as Bauchemin testified that it began to ring when he (the witness) was on the first or east track, and he was going the same way as Blais and was driving the second team ahead of Blais, there being a team behind him between the one he was driving and the one Blais was driving, and there being some distance between the teams.

The witness Guilman testified that she heard the whistle of

the engine, and the witness Heath swore that he could hear the noise of the train coming.

From the lay of the land and the curve in the railroad the tracks extending towards the Woonsocket depot were visible to one approaching from the east for a much greater distance than were the tracks extending towards Providence, and Blais seemingly paid no attention to the train from Providence, as the witness Heath swore—"I thought by the action that this man (Blais) was watching the down train, (the one approaching on the east track) and the up train (the one approaching in the other direction on the west track) was right on to him."

According to the testimony the east gate was not lowered in time to prevent the deceased from driving on to the tracks, as the descending gate struck on top of the load of hay he was driving, and about in the middle thereof.

The testimony further disclosed that when Blais' horses got on to the first or east track the gate tender shouted to him in English to stop, and the witness Trottier swore that he halloed in English to Blais when on the east track to stop, but whether Blais understood he don't know, for Blais was a Frenchman and spoke no English. Whether if Blais did understand the meaning of the shouting he could have stopped and successfully retreated, what between the descending east gate and the approaching train on the east track, or whether it was wiser to have kept on advancing rather than then to have attempted to retreat nowhere appears.

The gates on both sides of the tracks on this occasion were worked together, and the gate tender lowered the east gate behind Blais and the west gate in front of him, so that he could not pass under the west gate off of the tracks on the west side, hence he was literally entrapped or penned in, for the gates were closed both behind him and before him, the train from Woonsocket was approaching him on the east track on his right hand, and the train from Providence was approaching him on the west track on his left hand. Blais kept on advancing across the tracks, and whether he would have crossed them in safety but for the lowering of the west

gate in front of him is a question of fact which the non suit precluded the jury from determining, and which we will now consider.

The testimony discloses that there were four witnesses to the accident sworn, viz.: Heath, Guilman, Trottier, and Normandin; but Trottier sheds no light whatever upon the question under consideration, indeed, he was not questioned at all in regard to it, and Normandin, whose opportunity for observation was not as good as that of either Heath or Guilman, thought that Blais had got across safely. Elise Guilman, a French woman who testified through an interpreter, was standing at the end of and near the crossing gate on the west or Woonsocket side of the tracks when the accident happened, and had ample opportunity for observation. The record of her examination on the point in question is as follows:

" *Question.* Did you see the crossing gates lowered across the avenue? *Answer.* Yes, sir. *Ques.* Where did those gates come down—those gates which were on the Hamlet side of the railroad? *Ans.* When Mr. Blais was driving his team the gateman lowered that gate on the Hamlet side on the load of hay, and the other one ahead of the horses. *Ques.* Could you see distinctly from where you stood? *Ans.* Yes, sir. . . . *Ques.* State whether or not the horses stopped before the train struck the team? *Ans.* I saw the horses stop on the gate. The gate stopped them. *Ques.* Which gate, on which side of the railroad? *Ans.* On the Woonsocket side. *Ques.* State whether Mr. Blais was going across the track rapidly or slowly? *Ans.* Not quickly, from what I saw. If the gate wasn't closed he could save himself easy." . . . . *Cross Examination.* " *Ques.* Did she think the man was getting into a dangerous position by going on the track at the time? *Ans.* No, if he didn't close him with the gate he could save himself easy."

Charles T. Heath also saw the accident from the west or Woonsocket side of the tracks. On this point he swore as follows: " *Ques.* Was your observation of this distinct?

*Ans.* I was close to it. When the car struck him close to the forward wheel, I was right there then. . . . . *Ques.* What prevented the horses and team, if anything, from going across and avoiding this accident? *Ans.* I couldn't say for certain as to that; but I thought at the time of it if that gate hadn't been let down so quick on the other side he would have had a good show to get across, but I couldn't say whether he would or not. *Ques.* That is to say, the westerly gate? *Ans.* Yes. *Ques.* Did they appear to stop before the train struck him? *Ans.* They got there, I should say, about the same time as the train. Perhaps they might have got over if the gates had been up. You put anything in front of horses in that way and it will stop the speed. It stops a horse to put anything in front of him. A good many people stop a runaway horse in that way."

The state of the testimony, then, is that one witness, Guilman, was positive that Blais would have got across safely but for the west gate having been closed in front of him, and that another witness, Heath, though not positive, thought that he had a good show to do so. If Blais would have crossed the tracks without injury but for the west gate having been closed in front of him then it would seem that the immediate cause of the injury was the closing of that gate.

Granting that Blais' own conduct had exposed him to the risk of injury, is the plaintiff on account of such negligence necessarily precluded from recovering? We think he is unless this case comes within the rule of the celebrated case of *Davies* v. *Mann,* 10 M. & W. 546, decided by the Court of Exchequer in 1842. In that case Davies having fettered the legs of a donkey, negligently allowed him to graze at large upon the highway, and Mann's servant coming along in a wagon ran over and killed the donkey who could not get out of the way. It was conceded that the act of the plaintiff in leaving the donkey on the highway so fettered as to prevent his getting out of the way of passing vehicles, was negligent and unlawful, but inasmuch as it appeared that the defendant by the exercise of ordinary care might have avoided run-

ning over the animal, the plaintiff was held entitled to recover.

In *Radley* v. *London & North Western Railway Co.*, L. R. 1 App. Cas. 754, 758, Lord Penzance, in the House of Lords, used this language, and the Lord Chancellor (Lord Cairns) stated that he concurred " with every word of it," viz.: " The law in these cases of negligence is, as was said in the Court of Exchequer Chamber, perfectly well settled and beyond dispute. The first proposition is a general one, to this effect, that the plaintiff in an action for negligence cannot succeed if it is found by the jury that he has himself been guilty of any negligence or want of ordinary care which contributed to cause the action. But there is another proposition equally well established, and it is a qualification upon the first, namely, that though the plaintiff may have been guilty of negligence, and although that negligence may, in fact, have contributed to the accident, yet if the defendant could in the result, by the exercise of ordinary care and diligence, have avoided the mischief which happened, the plaintiff's negligence will not excuse him. This proposition, as one of law, cannot be questioned. It was decided in the case of *Davies* v. *Mann*, 10 M. & W. 546, supported in that of *Tuff* v. *Warman*, 5 C. B. N. S. 573, and other cases, and has been universally applied in cases of this character without question."

In *Morris* v. *The C. B. & Q. R. R. Co.*, 45 Iowa, 29, 32, the plaintiff recovered a verdict of $3,000, and the case was an appeal from a District Court to the Supreme Court. The plaintiff was a stockman, and having left his prod poles in another place and wishing to know whether he would have time to get them before the arrival of a certain train which was expected about that time, stepped upon one of some loaded cars to which an engine and another car were about to be attached, to look for the train. While he was standing there the engine backed the other car against that on which he was standing, and he fell between them. It was claimed by plaintiff that the defendant was guilty of negligence in backing the engine and car with unusual speed and in not giving

him warning, of both which facts there was some evidence. On the other hand, defendant claimed that the plaintiff was guilty of negligence in standing on the car. It appeared that at the time of the accident the plaintiff was standing with his back to the engine, and near the forward end of the car. It is apparent that it was a dangerous position if other cars were to be backed against it. After stating the facts already given, the learned court said: "We are of the opinion that, taking the evidence altogether, we should not be justified in disturbing the verdict. The evidence shows that at the time of the accident one Platt, who was engaged as an employé of the defendant in making up the train, was standing upon a car next to the one upon which the plaintiff was standing, and saw the plaintiff standing in his dangerous position, and while the plaintiff was so standing Platt signalled to the engineer with his hands and arms to back the engine, and gave the plaintiff no warning. The plaintiff's negligence will not enable the defendant to escape liability if the act which caused the injury was done by defendant after it discovered the plaintiff's negligence, and if the defendant could have avoided the injury in the exercise of reasonable care." (Cases cited.) "As Platt exercised control over the movements of the locomotive, it was incumbent upon him to use reasonable care to avoid doing an injury by such movements. And if, as a reasonable man seeing the plaintiff's position on the car so near the forward end, with his back to the locomotive, he should have apprehended the accident which resulted from the movement produced by his signal, his negligence will be considered the proximate cause of the injury."

In *Northern Central Ry. Co.* v. *The State, use of Price et al.*, 29 Md. 420, 435, the Supreme Court of Maryland laid down the law in this wise: "It is doubtless true, that if the deceased, by his own negligence or want of ordinary care and caution so far contributed to his misfortune, that, but for such negligence or want of ordinary care and caution on his part, the misfortune and damage complained of would not have occurred, this action could not be sustained.

And if negligence has been mutual, in the production of the injury, no action lies, for the reason that, as there can be no apportionment of damages, there can be no recovery. Such negligence, however, must have been concurrent, and formed the proximate cause of the injury complained of, for if the negligence of the defendant was the proximate, and that of the deceased the remote cause of the injury, the action is maintainable, nothwithstanding the deceased may not have been entirely without fault. This principle is settled by many well considered cases," citing cases. "The mere negligence or want of ordinary caution on the part of the deceased, as was decided in the case of *Tuff* v. *Warman*, 5 C. B. N. S. 573, would not disentitle the plaintiff to recover, unless it were such that, but for such negligence or want of ordinary caution, the misfortune would not have happened; nor, if the defendant might, by the exercise of care on its part, have avoided the consequences of the neglect or carelessness of the deceased."

The principle of law laid down in *Davies* v. *Mann*, not only prevails in England, but largely in the United States, and numerous citations of cases are to be found in the text books. *Vide* Shearman & Redfield on Negligence, § 99 and notes; Paterson's Railway Accident Law, 51 *et sq.* and notes. The explanation of the rule in *Davies* v. *Mann*, given by Paterson, 55, is especially worthy of note. Says that writer: "The rule in *Davies* v. *Mann* has been misunderstood and misapplied. It means only that that negligence upon the part of the plaintiff which bars his recovery from the defendant must have been a proximate cause of the injury, and that it is not a proximate, but only a remote, cause of the injury, when the defendant, notwithstanding the plaintiff's negligence, might, by the exercise of ordinary care and skill, have avoided the doing of the injury. Thus stated, the rule is consistent with the theory upon which the doctrine of contributory negligence is based, and furnishes no support for that of comparative negligence."

But in the case at bar, as in many close cases, the difficulty is not so much in the statement of the rule as in the appli-

cation of it.    We have examined many cases bearing upon
the doctrine of proximate and remote causes as it has arisen
and been decided in the courts.    But in the words of Mr.
Justice Miller in regard to the cases cited before him in
United States Supreme Court, in *Insurance Company* v.
*Tweed*, 7 Wall. 44, 52, "It would be an unprofitable labor
to enter into an examination of these cases.    If we could de-
duce from them the best possible expression of the rule,"
*i. e.*, as to whether an alleged cause is proximate or remote,
"it would remain after all to decide each case largely upon
the special facts belonging to it, and often upon the very
nicest discriminations.    One of the most valuable of the *cri-
teria* furnished us by these authorities, is to ascertain whether
any new cause has intervened between the fact accomplished
and the alleged cause.    If a new force or power has inter-
vened, of itself sufficient to stand as the cause of the misfor-
tune, the other must be considered as too remote."

In seeking the cause of the injury in the case at bar, there-
fore, if it is alleged that Blais' attempting to cross the tracks
was the proximate cause, it devolves upon us to consider
whether there was any testimony tending to show that any
new cause had intervened between the fact accomplished and
the alleged cause.    If Blais' act in crossing the track was, in
the eye of the law, the proximate cause of the accident, then
his administrator is not entitled to recover.    That the acci-
dent would not have happened if Blais had not crossed the
tracks is beyond question, and so it would not have occurred
if he had not been teaming on that day.    His crossing the
track may have been the "agency," or "medium," or "op-
portunity," or "occasion," or "situation," or "condition,"
as it is variously styled, through or by which the accident
happened, but may not have been any part of its real and
controlling cause, and whether it was or not, depends upon
circumstances to be drawn from the testimony.    If Blais
could not have crossed the track in safety even if the west
crossing gate had been open, his attempting so to cross would
have been the proximate, the real and controlling cause of
the accident; and though the defendant may have been neg-

ligent in leaving the east gate open, the plaintiff could not have recovered on account of contributory negligence, the negligence of the deceased and of the defendant being contemporaneous, and both causing the accident. If, however, Blais would have crossed the tracks in safety but for the west gate having been lowered in front of his horses, then his being on the track was but a remote cause, and the lowering of that gate was the proximate, or real and controlling cause, the *causa causans*. If the negligence of Blais antedated that of the defendant by any appreciable and well defined period, no matter how brief the space, so that the gateman after discovering Blais' negligence could by the exercise of ordinary care have prevented the accident, it was incumbent on the gateman to have exercised it, and not to have done so was such negligence as to render the defendant liable. An important question, therefore, is, Did the gateman exercise ordinary care in lowering the west gate in front of Blais' horses?

The term *ordinary care* is a difficult one to define, as it is relative, and always dependent on relationship and circumstances. In some relations a slight want of care is a want of ordinary care because of the high duty that is owing; in other relations only a great failure of care is a want of ordinary care because there is only a duty of imperfect obligation owing; while in still other relations only a degree of care between the two extremes would constitute ordinary care. Therefore, where the circumstances require great care, then great care is only ordinary care; when they require only slight care, then only slight care becomes ordinary care; and so on between the two extremes on the same principle according to the circumstances of each case. The test of ordinary care is thus laid down in 16 Amer. & Eng. Encyc. Law, 402: "When a person in the observance or performance of a duty due to another has neither done nor omitted to do anything which an ordinarily careful and prudent person in the same relation and under the same conditions and circumstances would not have done or omitted to do, he has not failed to use ordinary care, and is therefore not guilty of

negligence even though damage may have resulted from his action or want of action. And, conversely, there has been a want of ordinary care, when a person in the observance or performance of a legal duty to another, has done or omitted to do something which an ordinarily careful and prudent person in the same relation and under similar circumstances and conditions would not have done or omitted, such act or omission being the proximate cause of injury to the other party to the relation."

As the defendant is responsible for the act of the gateman let us now apply the test of ordinary care just given, to his act in closing the west gate in front of Blais' horses. It was the duty of the gateman to close the gates at a proper time for the protection of passers by, and to keep such persons from going on to the track. In this case, if the witness Guilman is to be believed, he shut the east gate when it would do Blais no good, and shut the west one when it would do him only infinite harm; in other words the gateman converted what was intended as a safeguard into an instrumentality of danger and death. Certainly, whatever the gateman's duty to Blais was as to attempting to close the east gate, it was imperatively incumbent upon him not to close the west gate so as to imperil Blais' safety, and if there was any reason why one gate could not have been raised or lowered without the other, then the gateman should have ceased lowering the gates when he found Blais was advancing under the east gate, and, if necessary, have raised them so that Blais might have passed off the tracks on the west side; and nothing was apparent in the testimony to indicate any difficulty in doing so.

In our opinion the case at bar, as it now presents itself, turns upon the question whether the gateman's lowering the west gate in front of Blais' horses was what prevented Blais, as a matter of fact, from crossing the tracks in safety, and if so, whether there were any excusing circumstances that relieve such gateman's act from being negligence for which the defendant would be liable. If there was time for Blais to have safely crossed but for the closing of the west gate and

there were no excusing circumstances in the gateman's conduct, then the defendant would be liable ; otherwise it would not be liable.    As the witness Guilman's testimony is positive that Blais was stopped by the gate, which is reinforced somewhat by the witness Heath, and, perhaps, to a certain extent, by the witness Normandin, there certainly was a question of fact that should have been passed upon by the jury, which the non suit precluded.

In *Clarke* v. *R. I. Electric Lighting Co.*, 16 R. I. 463, 465, Chief Justice Durfee in delivering the opinion of the court, said : "Generally the question of negligence is a question of fact to be determined by the jury ; but sometimes, when there is no controversy as to the facts, and when it clearly appears from them what course a person of ordinary prudence would pursue, it is a question for the court. So, when the standard of duty is fixed, or when the negligence is clearly defined and palpable, the court will not leave the case to the jury.    But cases of this kind are few, and are generally cases in which the situation is so simple that any person of ordinary prudence would instantly perceive what to do or what to refrain from doing. . . . . But where the facts are complicated or extraordinary the case is usually left, and properly left, to the jury.    So, whether the facts be disputed or not, if they are such that different minds, fairly considering them, might draw different conclusions from them, the question of negligence is for the jury.    2 Thompson on Negligence, 1286 ; *Boss* v. *Providence & Worcester R. R. Co.*, 15 R. I. 149, 154."

We think the testimony should have been allowed to be passed upon by the jury under proper instructions as to contributory negligence and the qualifications thereto.

*Petition granted.*

*Elisha C. Mowry & Livingston Scott*, for plaintiffs.
*Walter B. Vincent & Amasa M. Eaton*, for defendant.